**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| GREE, INC., | § | Case No.: |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SUPERCELL OY, | § | |
| | § | |
| Defendant. | § | |

**COMPLAINT**

Plaintiff GREE, Inc. ("GREE" or "Plaintiff") files this Complaint against Supercell Oy ("Supercell" or "Defendant").  In this Complaint, GREE asserts U.S. Patent Nos. 10,549,187 (the "'187 Patent"); 10,610,771 (the "'771 Patent"), and 10,625,149 (the "'149 Patent") against at least Supercell's "Clash Royale" game.  GREE alleges as follows:

**PARTIES**

1.      Plaintiff GREE is a corporation organized under the laws of Japan with a principal place of business at 6-10-1, Roppongi, Roppongi Hills Mori Tower Minato-Ku, Tokyo, Japan.

2.      Defendant Supercell Oy is a corporation organized under the laws of Finland, with a principal place of business at Itämerenkatu 11-13, Helsinki, Uusimaa, 00180, Finland.

**JURISDICTION AND VENUE**

3.      This action arises under the patent laws of the United States, Title 35 of the United States Code.  Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

4.      This Court has personal jurisdiction over Supercell because it has, directly or through agents and/or intermediaries, committed acts within Texas, including within this District,

giving rise to this action and/or has established minimum contacts with Texas and this District such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

5.    Supercell regularly conducts business in Texas, including this District, and purposefully avails itself of the privileges of conducting business in Texas.   In particular, Supercell, directly and/or through its agents and/or intermediaries, makes, uses, imports, offers for sale, sells, and/or advertises its products and affiliated services in Texas, including this District.  Defendant has placed, and continues to place, infringing products into the stream of commerce, via an established distribution channel, including iTunes and Google Play stores, with the knowledge and/or understanding that such products are sold to and/or used by users in the United States, including in Texas and specifically including this District.

6.    Alternatively, and/or in addition, this Court has jurisdiction over Supercell Oy under Federal Rule of Civil Procedure 4(k)(2).  This action arises from actions of Supercell Oy directed toward the United States, including (1) committing at least a portion of the infringing acts alleged herein and (2) regularly transacting business, soliciting business, and deriving revenue from the sale of goods and services, including infringing goods and services, to individuals in the United States.  Therefore, Supercell Oy has purposefully availed itself of the benefits of the United States, including the Eastern District of Texas, and the exercise of jurisdiction over Supercell would not offend traditional notions of fair play and substantial justice.

7.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(c), as Supercell Oy is not a resident of the United States.

## GREE AND THE ASSERTED PATENTS

8.      GREE is a global social media company that provides mobile content and services, including games, entertainment, media, advertising, and investment services.

9.      Originally founded in 2004, GREE has long sought to develop and create innovative solutions in gaming and social networking.   GREE has sought to protect its investments in innovation by obtaining patent protection.  GREE currently holds patents covering various improvements in digital and gaming technology in countries throughout the world, including the United States.

## THE SANO PATENT

10.      GREE is the owner by assignment of all right, title, and interest in and to the '187 Patent entitled "Server Device, User Device, Method for Controlling Server Device, Recording Medium, and System," which duly and legally issued on February 4, 2020. A copy of the '187 Patent is attached to this Complaint as Exhibit A.

11.      The '187 Patent describes and claims different aspects of innovative systems and methods for controlling and presenting games to users on a computer or mobile device. For example, the '187 Patent explains that an object of the invention is to "provide a server device, a user device, a method for controlling a server device, a recording medium, and a system capable of enhancing flexibility of a reward winning game and maintaining user's interest in the game." '187 Patent at col. 1:62-67.

12.      The specification of the '187 Patent explains that in conventional games, "a package (a set or group) of rewards is made available for each user, and any reward once given to the user is deleted from the package so that the same reward will not be given to the user in a duplicate manner." *Id.* at col. 1:37-41.  The specification further explains that in conventional

games, "a user is allowed to reset the package" and "is also allowed to replace the package with another package." *Id.* at col. 1:48-50. But "for example, if the user wants to regain any reward already won or wants to receive a reward not included in the package, the user cannot receive such rewards unless the user abandons all of the rewards so far won." *Id.* at col. 1:52-56. A problem with such prior art techniques is that such a game "lacks flexibility and limits the user's activity," thus making it "difficult to maintain the user's interest" and "raising the possibility that the user may soon become bored with the game." *Id.* at col. 1:56-61.

13.     To resolve these issues, the specification describes an innovative user interface and game play in which a "user plays a package-type reward winning game" and that "the user updates the package as needed." *Id.* at col. 4:36-38. And "[a] portable device, in accordance with an instruction from the user, requests a server to give a reward, update the package, etc.," which the server subsequently does. *Id.* at col. 4:38-42. The specification further explains that a package can be updated "by applying a modified package to the package," in which examples of modifications can include addition, deletion, or replacement. *Id.* at col. 4:43-53. And a "user can obtain such a modified package by various means," such as "playing a battle game." *Id.* at col. 4:54-56. Also, "the user can possess more than one modified package," and "can use the possessed modified package at any desired time." *Id.* at col. 4:56-58.

14.     The specification further explains that "the flexibility of the reward winning game can be enhanced" by means of these techniques "making it possible to apply various types of operation such as the addition of rewards to the existing package by using such modified packages." *Id.* at col. 4:58-62.

15.     The '187 Patent also describes a client device with various game screens that provide innovative user interfaces that can display various stages of the reward winning game,

including the start of the game (*e.g.*, Fig. 4A; col. 7:45-67); "a rewarding screen" that "is displayed in response to the reward request entered from the home screen" (*e.g.*, Fig. 4B, col. 8:1-12); "a package confirmation screen" (*e.g.*, Fig. 4C, col. 8:13-24); and "a package resetting screen" (*e.g.*, Fig. 4D, col. 8:25-44). The '187 Patent further explains that "the image 401 of each reward may be sized differently according to the rarity of the reward or like criteria. For example, the higher the rarity of the reward, the larger the image of the reward may be made." (Col. 7:64-67.)

16.     Other innovative user interfaces provided in the '187 Patent include "a modified package selection screen" (*e.g.*, Fig. 5A, col. 8:45-9:2) and "a package updating screen" (*e.g.*, Fig. 5B, col. 9:3-23). The '187 Patent also explains that "modified packages may be displayed in order of rarity or other criteria," and that "modified packages with higher rarity scores may be displayed at higher positions on the screen." (Col. 8:60-63.)

17.     The claims of the '187 Patent are rooted in computer technology and cannot be performed without a computer.  The claims are directed to specific improved graphical user interfaces and functionality on computers and mobile devices, and are inextricably tied to computer technology.

18.     A computer-implemented game using the particular visual presentation described and claimed in the '187 Patent was not common or conventional in the art of computer-implemented reward collection games at the time of the invention of the '187 Patent. Conventional reward collection games did not include the package updating and replacement features in the manner described and claimed in the '187 Patent.  The particular user interface and manner of conducting the game greatly enhanced the gameplay for users. Also the invention disclosed and claimed in the '187 Patent revised the user's display based on, for example, the

rarity of various rewards.

19.    These improvements over prior art and conventional gaming devices, systems, and methods represent meaningful limitations and/or inventive concepts.  Further, in view of these specific improvements, the inventions of the asserted claims, when such claims are viewed as a whole and in ordered combination, are not routine, well-understood, conventional, generic, existing, commonly used, well-known, previously known, or typical.

20.    Each claim of the '187 Patent recites a distinct and particular invention. No single claim of the '187 Patent is representative for purposes of determining subject matter eligibility under 35 U.S.C. § 101.

## THE KAMEKAWA PATENTS

21.    GREE is the owner by assignment of all right, title, and interest in and to the '771 and '149 Patents, both of which are entitled "Program, Method, and System of Transmitting or Receiving Message" (collectively, the "Kamekawa Patents").  The '771 Patent duly and legally issued on April 7, 2020.  A copy of the '771 Patent is attached to this Complaint as Exhibit B. The '149 Patent duly and legally issued at 12:00 a.m. Eastern Daylight Time on April 21, 2020.

22.    The Kamekawa Patents describe and claims different aspects of innovative systems and methods for controlling and presenting games to users on a computer or mobile device. For example, the Kamekawa Patents explain that an object of the invention is to "provide a program, a method, and a system of communicating a message in order to achieve variety of communication in chatting."  Exhibit B, '771 Patent, at col. 1:57-60.

23.    The specification of the Kamekawa Patents explains that in conventional services, "a user converses with other users registered in a group by exchanging messages," and that "the users converse with each other using texts or designed illustrations called 'stickers.'" *Id.* at col.

1:24-28. The specification further explains that in a conventional "social game in which a plurality of users can participate, a user can play a match against other users or play the game in cooperation with each other." *Id.* at col. 1:29-35.

24.     In such conventional games, " a user's input text or selected sticker is displayed on a timeline view of the terminals of all participants in the chat in the order of sending," and "the messages can be output to the terminals." *Id.* at col. 1:36-39.

25.     But using such prior art techniques, "it is difficult to perform a varied communication." *Id.* at col. 1:40-41. In addition, "pauses in face-to-face communications can be filled by adding time-killing elements and game elements to the communication." *Id.* at col. 1:42-44. And further, "it is difficult to achieve a smooth communication only by transmitting a given text or sticker in the chat." *Id.* at col. 1:45-46.

26.     Also, in order "to improve communication," conventionally, "a game application can be used together with a communication correspondent." *Id.* at col. 1:47-48.  But "[i]n this case, however, the user needs to log out of the chat." *Id.* at col. 1:49. In other words, it was "necessary to stop the chat on a chat application and use a game application other than the chat application. For this reason, it is difficult for the user to use the game application without terminating the chat." *Id.* at col. 1:50-53.

27.     To resolve such issues, the specification describes an innovative user interface and game control system and method designed "to achieve variety of communication in chatting." *Id.* at col. 1:57-60. For example, in this innovative and novel approach, "[a] controller receives a message from a first user terminal of user terminals belonging to a chat group. If the type of the received message is of a normal message, the controller transmits the message to each of the user terminals belonging to the chat group. If the type of the received message is a selection

of the game icon, the controller generates a game message according to a game logic corresponding to the game icon, and transmit the generated game message to each of the user terminals belonging to the chat group." *Id.* at col. 1:64-2:6.

28.    The Kamekawa Patents also describe a client device with a variety of exemplary game and chat screens that provide innovative user interfaces that can display various aspects of the invention—*see, e.g.*, *id.* at Figs. 3, 5, 6, 8-14, 16, 17, 19, 20, and 22-24 and accompanying text. These innovative features in the Kamekawa Patents revise the chat interface and modify a device's display in unconventional ways.

29.    The claims of the Kamekawa Patents are rooted in computer technology and cannot be performed without a computer.  The claims are directed to specific improved graphical user interfaces and functionality on computers and mobile devices, and are inextricably tied to computer technology.

30.    A computer-implemented messaging service using the particular visual presentation described and claimed in the Kamekawa Patents was not common or conventional in the art of computer-implemented games and messaging services at the time of the invention of the Kamekawa Patents.  Conventional games and messaging services did not include the communication features in the manner described and claimed in the Kamekawa Patents. For example, the Kamekawa Patents revise a chat interface in a way that is different from the prior art and unconventional.  The particular user interface and manner of conducting the game greatly enhanced the gameplay and chat functionality for users.

31.    These improvements over prior art and conventional gaming devices, systems, and methods represent meaningful limitations and/or inventive concepts.  Further, in view of these specific improvements, the inventions of the asserted claims, when such claims are viewed

as a whole and in ordered combination, are not routine, well-understood, conventional, generic, existing, commonly used, well-known, previously known, or typical.

32.    Each claim of the Kamekawa Patents recites a distinct and particular invention. No single claim of the Kamekawa Patents is representative for purposes of determining subject matter eligibility under 35 U.S.C. § 101.

## GENERAL ALLEGATIONS

33.    Defendant Supercell makes, uses, sells, offers for sale, and/or imports into the United States gaming systems, software, or methods for controlling games in which users do battle, including Clash Royale.

34.    Clash Royale operates on computers and mobile devices, including those with iOS and Android operating systems.

35.    Defendant Supercell operates, places into service, or otherwise controls a plurality of servers worldwide, including in the United States, on which Supercell operates, and its customers and other users use, software related to Clash Royale and on which Supercell stores user data associated with the products.

36.    Clash Royale has millions of registered users worldwide, including in the United States and Texas.

37.    On December 23, 2016, GREE sent a letter to Supercell specifically identifying a foreign counterpart to the '187 Patent (JP6034532). At that time, the application that issued as the '187 Patent was already pending. Supercell has been on notice of the '187 Patent and/or has been willfully blind to its existence since its date of issuance.

38.    Additionally, Supercell has had knowledge of the '187, '771, and '149 Patents at least since the date of filing of this Complaint.

## COUNT I—INFRINGEMENT OF THE '187 PATENT

39.    GREE re-alleges and incorporates by reference each and every allegation contained in the paragraphs 1-38 as if fully set forth herein.

40.    Supercell directly infringes at least claim 1 of the '187 Patent by, without authority, making, using, importing, selling, or offering to sell Clash Royale in the United States, in violation of 35 U.S.C. § 271(a).

41.    For example, claim 1 of the '187 Patent recites:

[preamble] A server device for providing a game to a plurality of user devices, the server device comprising:

[a] circuitry configured to:

[b] store, in a memory, a set of identifiers of a plurality of game rewards of a data package and rarity levels of the plurality of game rewards;

[c] communicate with at least one of the plurality of user devices;

[d] cause a first user of the plurality of users to participate in an event proceeding in the game;

[e] store, in the memory, a replacement package in association with the first user who has participated in the event, the replacement package being related to at least one game reward;

[f] update a group including the data package and the replacement package corresponding to the first user, by adding the at least one game reward indicated by the replacement package to the group, with deleting at least one game reward in association with the first user from the group;

[g] generate first information for displaying an image of the replacement package;

[h] generate second information for displaying at least a part of images of game rewards related to the updated group on a respective user device of the first user, the images of the game rewards having different appearances according to the rarity levels of the respective game rewards; and

[i] give at least one game reward from the updated group to the first user.

42.    To the extent the preamble is limiting, Clash Royale includes "[a] server device for providing a game to a plurality of user devices."  The Clash Royale game allows users to

"[d]uel players from around the world in real-time in both 1v1 and 2v2 Battles" using computers or mobile devices running the iOS or Android operating systems. *See* https://itunes.apple.com/us/app/clash-royale/id1053012308?mt=8.  An example is shown in the annotated figure below.[1]



43.    With respect to elements 1[a], 1[b], and 1[c], Clash Royale configures circuitry to store in a memory a set of identifiers of a plurality of game rewards of a data package and rarity levels of the plurality of game rewards, and communicates with at least one of the plurality of user devices. For example, in Clash Royale, a set of cards corresponds to the recited plurality of game rewards, and temporarily acquired cards correspond to a data package. Further, in Clash Royale, the cards have rarity levels. An example is shown in the annotated figure below:

---

[1] *See* https://www.youtube.com/watch?v=yTFn9_x1jMw (last visited April 5, 2020).



44.     With respect to claim element 1[d] Clash Royale causes a first user of the plurality of users to participate in an event proceeding in the game. For example, the annotated figure below shows the lightning chest process in Clash Royale:



45.     With respect to claim element 1[e], Clash Royale stores in a memory a

preplacement package in association with the first user who has participated in the event, and the replacement package being related to at least one game reward. For example the royal Giant card x103 is an example of a replacement package that is related to at least one Royal Giant card that is an example of a reward, as depicted in the annotated example below.



46. With respect to claim elements 1[f] and 1[g], Clash Royale updates a group including the data package and the replacement package corresponding to the first user, by adding the at least one game reward indicated by the replacement package to the group, with deleting at least one game reward in association with the first user from the group and generates first information for displaying an image of the replacement package. For example, Clash Royale adds the at least one Royal Giant card (corresponding to a reward) indicated by the Royal Giant Card x103 (corresponding to a replacement package) to the group, and deleting at least one Fire Spirits card (corresponding to the deleted reward) from the group, as shown in the annotated figures below.



47.     With respect to claim elements 1[h] and 1[i], Clash Royale generates second information for displaying at least a part of images of game rewards related to the updated group on a respective user device of the first user, the images of the game rewards having different appearances according to the rarity levels of the respective game rewards and gives at least one game reward from the updated group to the first user.  For example, as shown in the exemplary annotated images below, the images of the cards (corresponding to rewards) have different border colors according to the rarity level of the respective card.



48.    Supercell indirectly infringes the '187 Patent within the United States by inducing infringement under 35 U.S.C. § 271(b).  For example, since learning of the '187 Patent and by failing to cease offering Clash Royale, Supercell has knowingly and intentionally induced Clash Royale users to directly infringe one or more claims of the '187 Patent, *inter alia*, by (1) providing instructions or information, for example on publicly available websites (*see, e.g.*, https://supercell.helpshift.com/a/clash-royale/?p=web&l=en&s=battle and linked pages), to explain how to use the Clash Royale application in an infringing manner, including the use of the Clash Royale application in the manners described in the foregoing paragraphs, which are expressly incorporated herein, and (2) touting infringing uses of Clash Royale in advertisements, including but not limited to those listed on or available from their websites and other mobile application marketplace websites.

49.    Supercell indirectly infringes the '187 Patent by contributing to the direct infringement by end users under 35 U.S.C. § 271(c) by providing Clash Royale, which, as evidenced by Supercell's websites and advertisements (*see, e.g.*, https://supercell.helpshift.com/a/clash-royale/?p=web&l=en&s=battle and linked pages), is especially made for use in a manner that infringes one or more claims of the '187 Patent as described herein and has no substantial non-infringing uses.

50.    GREE has been and continues to be injured by Supercell's infringement of the '187 Patent.  GREE is entitled to recover damages adequate to compensate it for Supercell's infringing activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

51.    Unless enjoined by this Court, Supercell's acts of infringement will continue to damage and cause irreparable harm to GREE.

## COUNT II—INFRINGEMENT OF THE '771 PATENT

52.     GREE re-alleges and incorporates by reference each and every allegation contained in the paragraphs 1-38 as if fully set forth herein.

53.     Supercell directly infringes at least claim 1 of the '771 Patent by, without authority, making, using, importing, selling, or offering to sell Clash Royale in the United States, in violation of 35 U.S.C. § 271(a).

54.     For example, claim 1 of the '771 Patent recites:

[preamble] A game control method comprising:

[a] transmitting, to terminals of a plurality of users, data for displaying a chat screen comprising a game icon for entry to a game and one or more messages sent from at least a part of the plurality of users:

[b] causing display of the game icon in the chat screen on a terminal of a first user of the plurality of users;

[c] in response to selection of the game icon by the first user,

[d] transmitting, to the terminal of the first user, data for displaying a waiting message indicating waiting for an entry of another user to the game in the chat screen, and

[e] transmitting, to terminals other than the terminal of the first user, data for displaying an icon for the entry to the game in the chat screen;

[f] in response to the icon for the entry to the game being selected by a second user other than the first user, receiving the entry of second user;

[g] when a number of a group associated with the game icon and a number of users who have entered the game satisfy a first relationship, transmitting, to at least a part of the terminals of the plurality of users, data for displaying a player group including at least the first user and the second user who has entered the game in the chat screen;

[h] conducting a battle by the player group; and

[i] transmitting, to at least part of the terminals of the plurality of users, data for displaying a result of the battle in the chat screen.

55.     To the extent the preamble is limiting, Clash Royale includes "[a] game control method." The Clash Royale game allows users to "[d]uel players from around the world in real-time in both 1v1 and 2v2 Battles" using computers or mobile devices running the iOS or Android

- 16 -

operating systems. *See* https://itunes.apple.com/us/app/clash-royale/id1053012308?mt=8. Also, Clash Royale includes a Friendly Battle feature. Friendly battles are practice matches where a user competes with others such as friends or members of his or her clan. *See generally* https://clashroyale.fandom.com/wiki/Friendly_Battle.

56.     With respect to elements 1[a] and 1[b], Clash Royale transmits to terminals of a plurality of users, data for displaying a chat screen comprising a game icon for entry to a game and at least one or more messages sent from at least a part of the plurality of users, and causes the display of the game icon in the chat screen on a terminal of a first user of the plurality of users. For example, the Friendly Battle feature includes on the display of a first user's terminal a chat screen with messages from users as well as a game icon, as shown in the annotated figure below.



57.     With respect to claim elements 1[c] and 1[d], Clash Royale in response to a selection of the game icon by the first user, transmits to the first user's terminal data for displaying a waiting message indicating waiting for an entry of another user to the game in the chat screen, an example of which is shown in the annotated image below:



a waiting message indicating waiting for entry of another user to the game

58.    With respect to claim elements 1[e] and 1[f], Clash Royale transmits to terminals other than the first user's terminal, data for displaying an icon for the entry to the game in the chat screen and in response to the icon for the entry to the game being selected by a second user other than the first user, receives the entry of the second user, an example of which is shown in the annotated image below:



an icon for the entry to the game

59.    With respect to claim element 1[g], when a number of a group associated with the game icon and a number of users who have entered the game satisfy a first relationship, Clash Royale transmits, to at least a part of the terminals of the plurality of users, data for displaying a player group including at least the first user and the second user who has entered the game in the chat screen. For example, the chat screen in Clash Royale indicates the name of the user who entered the game. Thus, for example, when four users have entered a game, the user in the chat room can recognize that all of the users required to commence a 2v2 battle have entered. The annotated figure below shows an example of this aspect of Clash Royale.



a player group comprising the first user and the second user who have entered the game

60.     With respect to claim element 1[h], Clash Royale conducts a battle by the player group. For example, as shown in the annotated screenshot below, a Friendly Battle is waged.



61.     With respect to claim element 1[i], Clash Royale transmits to at least part of the terminals of the plurality of users data for displaying a result of the battle in the chat screen. As reflected in the annotated screenshot below, Clash Royale allows a user to click the "i" button in the chat screen.  After that button is clicked, the result of the battle is displayed to the user in the

chat screen.



62.    Supercell indirectly infringes the '771 Patent within the United States by inducing infringement under 35 U.S.C. § 271(b).  For example, since learning of the '771 Patent and by failing to cease offering Clash Royale, Supercell has knowingly and intentionally induced Clash Royale users to directly infringe one or more claims of the '771 Patent, *inter alia*, by (1) providing instructions or information, for example on publicly available websites (*see, e.g.*, https://supercell.helpshift.com/a/clash-royale/?p=web&l=en&s=battle and linked pages), to explain how to use the Clash Royale application in an infringing manner, including the use of the Clash Royale application in the manners described in the foregoing paragraphs, which are expressly incorporated herein, and (2) touting infringing uses of Clash Royale in advertisements, including but not limited to those listed on or available from their websites and other mobile application marketplace websites.

63.    Supercell indirectly infringes the '771 Patent by contributing to the direct

infringement by end users under 35 U.S.C. § 271(c) by providing Clash Royale, which, as evidenced by Supercell's websites and advertisements (*see, e.g.*, https://supercell.helpshift.com/a/clash-royale/?p=web&l=en&s=battle and linked pages), is especially made for use in a manner that infringes one or more claims of the '771 Patent as described herein and has no substantial non-infringing uses.

64.     GREE has been and continues to be injured by Supercell's infringement of the '771 Patent.  GREE is entitled to recover damages adequate to compensate it for Supercell's infringing activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

65.     Unless enjoined by this Court, Supercell's acts of infringement will continue to damage and cause irreparable harm to GREE.

## COUNT III—INFRINGEMENT OF THE '149 PATENT

66.     GREE re-alleges and incorporates by reference each and every allegation contained in the paragraphs 1-38 as if fully set forth herein.

67.     Supercell directly infringes at least claim 1 of the '149 Patent by, without authority, making, using, importing, selling, or offering to sell Clash Royale in the United States, in violation of 35 U.S.C. § 271(a).

68.     For example, claim 1 of the '149 Patent recites:

[preamble] A game control method at a terminal used by a user, the method comprising:

[a] receiving first data indicating one or more messages sent from one or more users

[b] displaying on a display of the terminal, a chat screen comprising a game icon for entry to a game and the one or more messages based on the first data;

[c] in response to the game icon being selected by the user, transmitting second data indicating that the game icon is selected;

[d] displaying a waiting message indicating waiting for an entry of at least

one of the one or more users to the game in the chat screen after transmitting the second data;

[e] receiving a third data indicating a user of the one or more users who has selected the icon for the entry to the game while the waiting message is displayed;

[f] displaying information indicating the user who has selected the icon for the entry to the game in the chat screen while the waiting message is displayed based on the third data;

[g] when a number of a group associated with the game icon and a number of the users who have entered the game satisfy a first relationship, displaying a player group composed of the users who have entered the game in the chat screen;

[h] receiving fourth data relating a battle by the group;

[i] displaying the battle on the display based on the fourth data; and

[j] displaying a result of the battle in the chat screen.

69.    To the extent the preamble is limiting, Clash Royale includes "[a] game control method at a terminal used by a user."  The Clash Royale game allows users to "[d]uel players from around the world in real-time in both 1v1 and 2v2 Battles" using computers or mobile devices running the iOS or Android operating systems.  *See* https://itunes.apple.com/us/app/clash-royale/id1053012308?mt=8.  Also, Clash Royale includes a Friendly Battle feature.  Friendly battles are practice matches where a user competes with others such as friends or members of his or her clan.  *See generally* https://clashroyale.fandom.com/wiki/Friendly_Battle.

70.    With respect to elements 1[a] and 1[b], Clash Royale receives data indicating one or more messages sent from users and displays a chat screen comprising a game icon for entry to a game and the one or more messages. For example, the Friendly Battle feature includes on the display of a first user's terminal a chat screen with messages from users as well as a game icon, as shown in the annotated figure below.



71.    With respect to claim elements 1[c] and 1[d], Clash Royale in response to a selection of the game icon by the first user, transmits second data indicating that the game icon is selected and displays a waiting message indicating waiting for an entry of another user to the game in the chat screen, an example of which is shown in the annotated image below:



72.     With respect to claim elements 1[e] and 1[f], Clash Royale receives a third data indicating that a user has selected the icon for the entry to the game and displays information indicating the user who has selected the icon while the waiting message is displayed based on the third data, an example of which is shown in the annotated image below:





73.     With respect to claim element 1[g], when a number of a group associated with the game icon and a number of users who have entered the game satisfy a first relationship, Clash Royale displays a player group composed of the users who have entered the game in the chat screen. For example, the chat screen in Clash Royale indicates the name of the user who entered the game. Thus, for example, when four users have entered a game, the user in the chat room can recognize that all of the users required to commence a 2v2 battle have entered. The annotated figure below shows an example of this aspect of Clash Royale.



a player group composed of the users who have entered the game

74.    With respect to claim elements 1[h] and 1[i], Clash Royale receives fourth data relating a battle by the group and displays the battle on the display based on the fourth data. For example, as shown in the annotated screenshot below, a Friendly Battle is waged.



75.    With respect to claim element 1[j], Clash Royale displays a result of the battle in the chat screen. As reflected in the annotated screenshot below, Clash Royale allows a user to click the "i" button in the chat screen.  After that button is clicked, the result of the battle is displayed to the user in the chat screen.



When the user clicks the "i" button in the chat screen, the battle result screen appears.

76.    Supercell indirectly infringes the '149 Patent within the United States by inducing infringement under 35 U.S.C. § 271(b).  For example, since learning of the '149 Patent and by failing to cease offering Clash Royale, Supercell has knowingly and intentionally induced Clash Royale users to directly infringe one or more claims of the '149 Patent, *inter alia*, by (1) providing instructions or information, for example on publicly available websites (*see, e.g.*, https://supercell.helpshift.com/a/clash-royale/?p=web&l=en&s=battle and linked pages), to explain how to use the Clash Royale application in an infringing manner, including the use of the Clash Royale application in the manners described in the foregoing paragraphs, which are

expressly incorporated herein, and (2) touting infringing uses of Clash Royale in advertisements, including but not limited to those listed on or available from their websites and other mobile application marketplace websites.

77.    Supercell indirectly infringes the '149 Patent by contributing to the direct infringement by end users under 35 U.S.C. § 271(c) by providing Clash Royale, which, as evidenced by Supercell's websites and advertisements (*see, e.g.*, https://supercell.helpshift.com/a/clash-royale/?p=web&l=en&s=battle and linked pages), is especially made for use in a manner that infringes one or more claims of the '149 Patent as described herein and has no substantial non-infringing uses.

78.    GREE has been and continues to be injured by Supercell's infringement of the '149 Patent. GREE is entitled to recover damages adequate to compensate it for Supercell's infringing activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

79.    Unless enjoined by this Court, Supercell's acts of infringement will continue to damage and cause irreparable harm to GREE.

## **PRAYER FOR RELIEF**

WHEREFORE, GREE prays for relief in its favor, as follows:

A.    Enter a judgment that Defendant Supercell has infringed, and willfully infringed, the '187, the '771, and the '149 Patents.

B.    Grant a permanent injunction restraining and enjoining Defendant Supercell and its officers, directors, agents, servants, employees, successors, assigns, parents, subsidiaries, affiliated or related companies, and attorneys from directly or indirectly infringing the '187, the '771, and the '149 Patents;

C.     Enter a declaration that this case is exceptional and correspondingly award GREE attorney fees and costs under 35 U.S.C. § 285;

D.     Award damages, enhanced damages, costs, and prejudgment interest to GREE under 35 U.S.C. § 284; and

E.     Grant such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

GREE hereby demands a jury trial on all issues appropriately triable by a jury.

DATED: April 21, 2020             GILLAM & SMITH, LLP


By  */s/ Melissa R. Smith*
    MELISSA R. SMITH
    (Texas State Bar No. 24001351)
    HARRY L. GILLAM, JR.
    (Texas State Bar No. 07921800)
    303 South Washington Avenue
    Marshall, Texas  75670
    Telephone:  (903) 934-8450
    Facsimile:   (903) 934-9257
    Email:  melissa@gillamsmithlaw.com
    Email:  gil@gillamsmithlaw.com

Of Counsel:

KILPATRICK TOWNSEND & STOCKTON LLP
STEVEN D. MOORE (CA Bar No. 290875)
TAYLOR J. PFINGST (CA Bar No. 316516)
Two Embarcadero Center, Suite 1900
San Francisco, CA  94111
Telephone:  (415) 576-0200
Facsimile:   (415) 576-0300
Email:  smoore@kilpatricktownsend.com
Email:  tpfingst@kilpatricktownsend.com

NORRIS P. BOOTHE (State Bar No. 307702)
1080 Marsh Road
Menlo Park, CA  94025
Telephone:  (650) 326-2400
Facsimile:   (650) 326-2422
Email:  nboothe@kilpatricktownsend.com

JOHN C. ALEMANNI (NC Bar No. 22977)
TAYLOR HIGGINS LUDLAM (NC Bar No.
42377)
KASEY KOBALLA (NC Bar No. 53766)
4208 Six Forks Road
Raleigh, NC  27609
Telephone:  (919) 420-1700
Facsimile:   (919) 420-1800
Email:  jalemanni@kilpatricktownsend.com
Email:  taludlam@kilpatricktownsend.com
Email: kkoballa@kilpatricktownsend.com

ALTON L. ABSHER III (NC Bar No. 36579)
1001 West Fourth Street
Winston-Salem, NC  27101
Telephone:  (336) 607-7300
Facsimile:   (336) 607-7500
Email:  aabsher@kilpatricktownsend.com

MICHAEL T. MORLOCK (GA Bar No. 647460)
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
Telephone:  (404) 815-6500
Facsimile:   (404) 815-6555
Email:  mmorlock@kilpatricktownsend.com

Attorneys for PLAINTIFF
GREE, Inc.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 21, 2020, all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system pursuant to Local Rule CV-5(a)(3):

<em>/s/ Melissa R. Smith</em>          