**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| GREE, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 2:20-cv-00113-JRG-RSP |
| | § | |
| SUPERCELL OY, | § | |
| | § | |
| *Defendant.* | § | |

## <u>CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER</u>

Before the Court is the opening claim construction brief (Dkt. No. 50[1]) of GREE, Inc. ("Plaintiff") filed on January 6, 2021, the response (Dkt. No. 54) of Supercell Oy ("Defendant"), filed on January 21, 2021, and Plaintiff's reply (Dkt. No. 56), filed on January 27, 2021. The Court held a hearing on the issues of claim construction and claim definiteness on February 22, 2021. Having considered the arguments and evidence presented by the parties at the hearing and in their briefing, the Court issues this Order.

---

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

## Table of Contents

I.     BACKGROUND ........................................................................................... 3

    A.    The '187 Patent ............................................................................... 3

    A.    The '771 Patent and '149 Patent .................................................... 4

II.    LEGAL PRINCIPLES .............................................................................. 6

    A.    Claim Construction .......................................................................... 6

    B.    Departing from the Ordinary Meaning of a Claim Term ...................... 8

    C.    Functional Claiming and 35 U.S.C. § 112, ¶ 6 (pre-AIA) / § 112(f) (AIA) ........... 9

    D.    Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA) ................ 11

III.    AGREED CONSTRUCTIONS ................................................................. 12

IV.    CONSTRUCTION OF DISPUTED TERMS ............................................ 13

    A.    "replacement package" ................................................................. 13

    B.    "event" ......................................................................................... 16

    C.    The Group Terms ......................................................................... 19

    D.    "chat screen" ................................................................................ 22

    E.    "battle," "conducting a battle by the player group," "conduct a battle by the player group," and "battle by the group" ....................... 26

    F.    "receiv[e/ing] the entry of the second user" ................................. 30

    G.    "satisfy a first relationship" ........................................................ 32

    H.    "a number of a group associated with the game icon" ................... 35

    I.    "… displaying a result of the battle in the chat screen …" and "… the result of the battle is displayed in the chat screen …" ................... 37

    J.    "display[ing] the battle on the display based on the fourth data" ......... 39

    K.    "the users who have entered the game" ......................................... 40

    L.    "the icon" ..................................................................................... 42

V.    CONCLUSION ........................................................................................ 45

## I.       BACKGROUND

Plaintiff alleges infringement of three U.S. Patents: Nos. 10,549,187 (the "'187 Patent");

10,610,771 (the "'771 Patent"); and 10,625,149 (the "'149 Patent") (collectively, the "Asserted

Patents"). The '187 Patent claims priority to a Japanese application filed on April 30, 2013. The

'771 Patent and '149 Patent each claim priority to a Japanese application filed on July 13, 2013.

The '771 Patent and '149 Patent are further related in that each issued from an application that is

a continuation of the application that issued as U.S. Patent No. 10,391,388 ("'388 Patent").

### A.       The '187 Patent

In general, the '187 Patent is directed to technology for improving the playability of a

package-type reward-giving mobile game.

The abstract of the '187 Patent provides:

> Provided is a server device, etc., capable of enhancing flexibility of a reward
> winning game and maintaining a user's interest in the game. The server device
> manages rewards to be given to a user, and includes a storage unit for storing a
> package as a set of data concerning rewards to be given to the user and a modified
> package as a set of data concerning rewards used to update the package, a
> communication unit for communicating with a user device of the user, and a
> package updating unit for updating the package by modifying the data concerning
> the rewards included in the package by using the data concerning the rewards
> included in the modified package when a package update request is received from
> the user device.

'187 Patent, *Abstract*.

Claim 1 of the '187 Patent, an exemplary device claim, recites:

> A server device for providing a game to a plurality of user devices, the server
> device comprising:
>   circuitry configured to:
>       store, in a memory, a set of identifiers of a plurality of game rewards of a
>         data package and rarity levels of the plurality of game rewards;
>       communicate with at least one of the plurality of user devices;
>       cause a first user of the plurality of users to participate in an ***event***
>         proceeding in the game;

> store, in the memory, a ***replacement package*** in association with the first
> user who has participated in the event, the replacement package being
> related to at least one game reward;
>
> ***update a group including the data package and the replacement package***
> ***corresponding to the first user***, by adding the at least one game reward
> indicated by the replacement package to the group, with ***deleting at least***
> ***one game reward in association with the first user from the group***;
>
> generate first information for displaying an image of the replacement
> package;
>
> generate second information for displaying at least a part of images of
> ***game rewards related to the updated group*** on a respective user device
> of the first user, the images of the game rewards having different
> appearances according to the rarity levels of the respective game
> rewards; and
>
> ***give at least one game reward from the updated group to the first user***.

'187 Patent, 17:62–18:24 (emphasis added).

### A.    The '771 Patent and '149 Patent

In general, the '771 Patent and '149 Patent are directed to technology for improving chat

ability for users playing a social game.

The abstracts of the '771 Patent and '149 Patent are identical and provide:

> A controller receives a message from a first user terminal of user terminals
> belonging to a chat group. In a case where the type of the message is of a normal
> message, the controller transmits the message to each of the user terminals. In a
> case where the type of the message is selection of the game icon, the controller
> generates a game message according to logic corresponding to the game icon and
> transmits the game message to each of the user terminals.

*See e.g.*, '771 Patent, *Abstract*.

Claim 1 of the '771 Patent and Claim 9 of the '149 Patent are exemplary method and device

claims. Claim 1 of the '771 Patent provides:

> A game control method comprising:
>
> transmitting, to terminals of a plurality of users, data for displaying a ***chat***
> ***screen*** comprising a game icon for entry to a game and one or more messages
> sent from at least a part of the plurality of users;
>
> causing display of the game icon in the chat screen on a terminal of a first user
> of the plurality of users;
>
> in response to selection of the game icon by the first user,

4

> transmitting, to the terminal of the first user, data for displaying a waiting message indicating waiting for an entry of another user to the game in the chat screen, and
>
> transmitting, to terminals other than the terminal of the first user, data for displaying an icon for the entry to the game in the chat screen;
>
> in response to the icon for the entry to the game being selected by a second user other than the first user, ***receiving the entry of the second user***;
>
> when ***a number of a group associated with the game icon*** and a number of users who have entered the game ***satisfy a first relationship***, transmitting, to at least a part of the terminals of the plurality of users, data for displaying a player group including at least the first user and the second user who has entered the game in the chat screen;
>
> ***conducting a battle by the player group***; and
>
> transmitting, to at least part of the terminals of the plurality of users, ***data for displaying a result of the battle in the chat screen***.

’771 Patent, 19:36–64 (emphasis added). Claim 9 of the ’149 Patent provides:

> A device comprising:
>
> circuitry configured to:
>
>> receive first data indicating one or more messages sent from one or more users,
>>
>> display, on a display of a terminal, a ***chat screen*** comprising a game icon for entry to a game and the one or more messages based on the first data,
>>
>> in response to the game icon being selected by the user, transmit second data indicating that the game icon is selected,
>>
>> display a waiting message indicating waiting for an entry of at least one of the one or more users to the game in the chat screen after transmitting the second data;
>>
>> receive a third data indicating a user of the one or more users who has selected ***the icon*** for the entry to the game while the waiting message is displayed,
>>
>> display information indicating the user who has selected the icon for the entry to the game in the chat screen while the waiting message is displayed based on the third data,
>>
>> when a number of a group associated with the game icon and a number of ***the users who have entered the game*** satisfy a first relationship, display a player group composed of the users who have entered the game in the chat screen,
>>
>> receive fourth data relating a ***battle*** by the group, ***display the battle on the display based on the fourth data***, and
>>
>> ***display a result of the battle in the chat screen***.

’149 Patent, 19:36–65 (emphasis added).

5

## II.     LEGAL PRINCIPLES

### A.     Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See Phillips*, 415 F.3d at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Id.* at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Id.* at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (vacated on other grounds).

"The claim construction inquiry … begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim

terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic*

*Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id*. Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*. The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

### B.    Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the

specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Solutions*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

### C.  Functional Claiming and 35 U.S.C. § 112, ¶ 6 (pre-AIA) / § 112(f) (AIA)

A patent claim may be expressed using functional language. *See* 35 U.S.C. § 112, ¶ 6; *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49, 1347 n.3 (Fed. Cir. 2015) (en banc in

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

relevant portion). § 112, ¶ 6 provides that a structure may be claimed as a "means … for performing a specified function" and that an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002).

But § 112, ¶ 6 does not apply to all functional claim language. There is a rebuttable presumption that § 112, ¶ 6 applies when the claim language includes "means" or "step for" terms, and that it does not apply in the absence of those terms. *Masco Corp.*, 303 F.3d at 1326; *Williamson*, 792 F.3d at 1348. The presumption stands or falls according to whether one of ordinary skill in the art would understand the claim with the functional language, in the context of the entire specification, to denote sufficiently definite structure or acts for performing the function. *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (§ 112, ¶ 6 does not apply when "the claim language, read in light of the specification, recites sufficiently definite structure" (quotation marks omitted) (citing *Williamson*, 792 F.3d at 1349; *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014))); *Williamson*, 792 F.3d at 1349 (§ 112, ¶ 6 does not apply when "the words of the claim are understood by persons of ordinary skill in the art to have sufficiently definite meaning as the name for structure"); *Masco Corp.*, 303 F.3d at 1326 (§ 112, ¶ 6 does not apply when the claim includes an "act" corresponding to "how the function is performed"); *Personalized Media Communications, L.L.C. v. International Trade Commission*, 161 F.3d 696, 704 (Fed. Cir. 1998) (§ 112, ¶ 6 does not apply when the claim includes "sufficient structure, material, or acts within the claim itself to perform entirely the recited function … even if the claim uses the term 'means.'" (quotation marks and citation omitted)).

When it applies, § 112, ¶ 6 limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347. Construing a means-plus-function limitation

10

involves multiple steps. "The first step … is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "[T]he next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Medtronic, Inc.*, 248 F.3d at 1311. A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* The focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.* The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). However, § 112 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

For § 112, ¶ 6 limitations implemented by a programmed general-purpose computer or microprocessor, the corresponding structure described in the patent specification must include an algorithm for performing the function. *See WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). The corresponding structure is not a general-purpose computer but rather the special purpose computer programmed to perform the disclosed algorithm. *See Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

### D.      Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2

and is therefore invalid as indefinite. *Nautilus,* 572 U.S. at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 911. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.,* 875 F.3d 1360, 1365 (Fed. Cir. 2017). "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "the court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005). The standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

In the context of a claim governed by 35 U.S.C. § 112, ¶ 6, the claim is invalid as indefinite if the claim fails to disclose adequate corresponding structure to perform the claimed function. *Williamson*, 792 F.3d at 1351–52. The disclosure is inadequate when one of ordinary skill in the art "would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim." *Id*. at 1352.

## III.    AGREED CONSTRUCTIONS

The parties have agreed to constructions set forth in their Joint Claim Construction Chart. Dkt. No. 57. Based on the parties' agreement, the Court hereby adopts the agreed constructions.

## IV.    CONSTRUCTION OF DISPUTED TERMS

### A.    "replacement package"

| Disputed Term[3] | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "replacement package"<br><br>• '187 Patent Claims 1, 7, 8 | package that is substituted for another package | a second data package comprising, a collection (or set) of identifiers of a plurality of game rewards |

**The Parties' Positions**

Plaintiff submits: The "replacement package" does not necessarily have the same structure as the "data package" separately recited in the claims. Further, the claims require that the replacement package is "related to at least one game reward," not that it has a collection of identifiers for multiple game rewards. Indeed, the patent describes that the replacement package may replace "a reward" in another package. Dkt. No. 50 at 16–18.

In addition to the claims themselves, Plaintiff cites **intrinsic evidence** to support its position: '187 Patent, 4:51–53.

Defendant responds: The '187 Patent "uniformly describes packages as containing identifiers of game rewards." The "data package" of the claims also expressly includes "a set of identifiers of a plurality of game rewards." And, as described in the patent, the "replacement package" must include "at least two identifiers of game rewards" in order to replace a reward; namely, "the ID of the reward to be replaced and the ID of the replaced reward." Dkt. No. 54 at 7–8.

---

[3] For all term charts in this order, the claims in which the term is found are listed with the term but: (1) only the highest-level claim in each dependency chain is listed, and (2) only asserted claims identified in the parties' Joint Claim Construction Chart (Dkt. No. 57) are listed.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '187 Patent, Figures 3b–3d, Figures 6a–6i, 7:11–31, 11:42–61, 12:18–22, 12:50–60, 13:3–49, 14:29–36.

Plaintiff replies: Defendant's proposed construction improperly limits the replacement package to an exemplary embodiment of a "modified package table" (not a "replacement package"). The '187 Patent discloses use of a singular reward ID, which embodiment would be improperly excluded by Defendant's construction. Dkt. No. 56 at 2.

Plaintiff cites further **intrinsic evidence** to support its position: '187 Patent, 7:23–31.

**<u>Analysis</u>**

The issue in dispute distills to whether a replacement package necessarily includes a plurality of identifiers for a plurality of rewards. It does not.

The claims provide significant context informing the meaning of the "replacement package." For instance, Claim 1 of the '187 Patent provides as follows:

> A server device for providing a game to a plurality of user devices, the server device comprising:
>   circuitry configured to:
>       store, in a memory, ***a set of identifiers of a plurality of game rewards of a <u>data package</u>*** and rarity levels of the plurality of game rewards;
>       communicate with at least one of the plurality of user devices;
>       cause a first user of the plurality of users to participate in an event proceeding in the game;
>       store, in the memory, ***a replacement package in association with the first user who has participated in the event***, the ***<u>replacement package</u> being <u>related to</u> at least one game reward***;
>       update a group including the data package and the replacement package corresponding to the first user, by adding ***the at least one game reward <u>indicated by</u> the <u>replacement package</u>*** to the group, with deleting at least one game reward in association with the first user from the group;
>       generate first information for displaying an image of the replacement package;
>       generate second information for displaying at least a part of images of game rewards related to the updated group on a respective user device of the first user, the images of the game rewards having different

14

> appearances according to the rarity levels of the respective game
> rewards; and
>
> give at least one game reward from the updated group to the first user.

'187 Patent, 17:61–18:24 (emphasis added). The claim defines attributes of both the data package and the replacement package. Notably, the data package expressly includes "a set of identifiers of a plurality of game rewards" while no such attribute is expressed for the replacement package. Rather, the replacement package is expressly "related to" at least one game reward, which game reward is "indicated by" the replacement package. And the replacement package is expressly in "association with" the first user. That the claims express an attribute of the data package that is not expressed for the replacement package indicates that "a set of identifiers of a plurality of game rewards" is not an inherent attribute of any package, data or replacement. *See Phillips*, 415 F.3d at 1314 (noting that the use of the term "steel baffles" "strongly implies that the term 'baffles' does not inherently mean objects made of steel").

The Court is not persuaded that the '187 Patent's descriptions of exemplary embodiments rise to the exacting standard required to import Defendant's proposed "collection (or set) of identifiers of a plurality of game rewards" limitation. The meaning of the "replacement package" as described in the patent is not so narrow. Notably, the patent provides:

> In the present embodiment, the user plays a package-type reward winning game.
> Further, the user updates the package as needed. A portable device, in accordance
> with an instruction from the user, requests a server to give a reward, update the
> package, etc. In response to the request received from the portable device, the server
> performs processing for giving a reward, updating the package, etc.
>
> The updating of the package is performed by applying a modified package to the
> package. The ***modified package*** defines a set of rewards and the type of operation
> ("addition", "deletion", or "replacement") to be applied to the existing package, and
> is ***classified as*** an addition package, a deletion package, or a replacement package
> ***according to the type of operation***. The addition package is one that adds a reward
> to the existing package. The deletion package is one that deletes a reward from the
> existing package. ***The replacement package is one that replaces a reward included
> in the existing package by another reward***.

15

'187 Patent, 4:36–53 (emphasis added). This describes that a replacement package is a form of a modified package, and further that it is a modified package "that replaces a reward included in the existing package by another reward." The other descriptions of embodiments that Defendant posits support reading the set-of-identifiers limitation into the claims are exemplary. *See, e.g.*, *id*., 7:11–12 ("FIGS. 3b to 3d are diagrams showing ***examples*** of the data structures of the various tables." (emphasis added)), 7:23–31 ("FIG. 3d shows the modified package table … [that] stores … ***such data as*** … the ID of the reward to be replaced and the ID of the replaced reward (in the case of 'replacement')" (emphasis added)).

The Court also rejects Plaintiff's proposed construction as improper. Specifically, as just described, the replacement package is not a package that is necessarily substituted for another package but rather is a package having information that is used to substitute one reward for another in an existing package. *See id*., Figures 6h–6i, (describing how an existing package is modified by replacing one reward in the package with another from a replacement package), 13:35–49 (describing using information extracted from the replacement package to replace a reward in an existing package).

Accordingly, the Court construes "replacement package" as follows:

- "replacement package" means "package that replaces a reward included in an existing package by another reward."

### B.     "event"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "event"<br><br>• '187 Patent Claims 1, 7, 8 | plain and ordinary meaning, no construction needed | a discrete activity engaged in by multiple users together |

**The Parties' Positions**

Plaintiff submits: The word "event" is used in the '187 Patent according to its common meaning. It is not limited to a "discrete activity" and it is not limited to something engaged in by "multiple users together." In fact, it is not clear what Defendant's proposed "discrete activity" requires. And while the patent describes an exemplary event involving multiple users, it does not limit events to such. Indeed, the parent application to the '187 Patent expressed a multiple-user limitation by expressing a "jointly participate" limitation in the claims that is not present here, indicating that a multiple-user limitation is not inherent to "event." Dkt. No. 50 at 18–19.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: Dkt. No. 50-5 at 2[4].

Defendant responds: As described and claimed, the "event" of the '187 Patent is necessarily a discrete activity involving multiple users. In fact, the '187 Patent contrasts the multi-player social-gaming activities of the invention from single-player activities. And the claims of the '187 Patent issued only after Plaintiff filed a terminal disclaimer over the parent patent, which requires joint participation in the events. This establishes Plaintiff's intent to limit the scope of "event" to an activity engaged in by multiple users together. Dkt. No. 54 at 9–10.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '187 Patent, 17:13–23; Dkt. No. 55-5 at 5; Dkt. No. 55-6; Dkt. No. 55-7; '723 Patent, 18:35–19:43, 19:55–22:29.

Plaintiff replies: The claims expressly require only that a "first user of a plurality of users" participate in an event. This language is plainly met by a single user participating in the event. Neither the description of the exemplary embodiments nor the terminal disclaimer over similar

---

[4] The '187 Patent is a continuation of the application that issued as U.S. Patent No. 9,498,723 ('723 Patent). '187 Patent, 1:5–12.

claims in the parent patent establishes that multiple users must participate in the event for it to be an event. Dkt. No. 56 at 3.

**<u>Analysis</u>**

There are two issues in dispute. First, whether an "event" is necessarily a "discrete" activity. It is not. Second, whether an "event" necessarily is an "activity engaged in by multiple users together." It is not.

The Court is not persuaded that the intrinsic record cited by Defendant rises to the exacting standard required to import Defendant's proposed "discrete activity engaged in by multiple users together" limitation. To begin, the "terminal disclaimer" over '723 Patent is premised on "conflicting claims [that] are not identical, but [where] at least one examined application claim is not patentably distinct from the reference claim." Dkt. No. 55-5 at 4–5. Thus, a terminal disclaimer does not mandate identity of scope between the "event" of the '187 Patent claims and the "event" of the claims of '723 Patent. Further, the "event" of '723 Patent is expressly recited as a joint event involving multiple users. *See, e.g.*, '723 Patent, 18:5–7 (Claim 1 reciting "a first plurality of users … jointly participate in one or more events"). That joint participation is expressed in the claims suggests that it is not inherent to "event." *See Phillips*, 415 F.3d at 1314 (noting that the use of the term "steel baffles" "strongly implies that the term 'baffles' does not inherently mean objects made of steel"). Further, the patent describes events with other users as exemplary. *See, e.g.*, '187 Patent, 17:13–23 ("For example, [a modified package] may be obtained … by participating in an event (for example, a RAID battle) by organizing a team with other users."). Finally, it is not clear what Defendant intends with its proposed "discrete" limitation and Defendant has not established that this construction is either helpful or correct.

18

Accordingly, the Court rejects Defendant's proposed construction and determines that this term has its plain and ordinary meaning without the need for further construction.

### C.    The Group Terms

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "deleting at least one game reward in association with the first user from the group"<br><br>• '187 Patent Claims 1, 7, 8 | plain and ordinary meaning, no construction needed | indefinite |
| "game rewards related to the updated group"<br><br>• '187 Patent Claims 1, 7, 8 | plain and ordinary meaning, no construction needed | indefinite |
| "giv[ing] at least one game reward from the updated group to the first user"<br><br>• '187 Patent Claims 1, 7, 8 | plain and ordinary meaning, no construction needed | indefinite |
| "update a group including the data package and the replacement package corresponding to the first user"<br><br>• '187 Patent Claims 1, 7, 8 | plain and ordinary meaning, no construction needed | indefinite |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**<u>The Parties' Positions</u>**

Plaintiff submits: As recited in the claims, "the replacement package only 'indicate[s]' 'the at least one game reward' and does not necessarily contain the indicated game reward itself." The claims further recite that "the replacement package [is] **related to** at least one game reward" (Plaintiff's emphasis). Thus, the replacement package does not necessarily include the reward that is added to the group that includes the replacement package. Dkt. No. 50 at 19–21.

19

In addition to the claims themselves, Plaintiff cites the following **extrinsic evidence** to support its position: Dkt. No. 50-6[5] ¶¶ 20, 35–54; Dkt. No. 50-7[6] ¶¶ 41–45.

Defendant responds: Because the "group including the data package and the replacement package" necessarily already includes the "game reward indicated by the replacement package" it is not reasonably certain what it means to update the group by adding the game reward. The updated group is the antecedent reference for the other "group" terms and the meanings of the other group terms are therefore not reasonably certain. The claim-recited terms "related to" and "indicated by" do not provide any reasonable scope to the claims "given neither term appears anywhere within the specification." Dkt. No. 54 at 10–13.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '187 Patent, 1:36–38, 4:43–53[7], 9:42–46, 13:35–49; Dkt. No. 55-19 at 11–15. **Extrinsic evidence**: Dkt. No. 50-6 ¶¶ 35–54; Dkt. No. 50-7 ¶¶ 41–45.

Plaintiff replies: The meaning of a replacement package "being related to" a reward and the reward being "indicated by" the replacement package is plain without the need for an explanation in the '817 Patent. Dkt. No. 56 at 3–4.

Plaintiff cites further **intrinsic evidence** to support its position: '187 Patent, 4:51–53[8].

---

[5] Declaration of Stacy Friedman in Support of Defendant's Claim Constructions (Dec. 1, 2020).
[6] Declaration of Dr. Robert Akl, D.Sc. in Support of Plaintiff's Claim Constructions for Certain Terms in the Asserted Patents (Dec. 1, 2020).
[7] Defendant cites '187 Patent, 2:43–53 but quote material found '187 Patent, 4:43–53.
[8] Plaintiff cites '187 Patent 9:42–46 but quotes material found at 4:51–53.

**Analysis**

The issue in dispute distills to whether a "replacement package" necessarily includes a reward such that updating a group including a data package and a replacement package by adding the reward is nonsensical. It does not.

As expressed in the claims and described in the '187 Patent the replacement package indicates a reward and does not necessarily contain the reward. For instance, Claim 1 provides:

> A server device for providing a game to a plurality of user devices, the server device comprising:
>   circuitry configured to:
>     store, in a memory, ***a set of identifiers of a plurality of game rewards of a data package*** and rarity levels of the plurality of game rewards;
>     communicate with at least one of the plurality of user devices;
>     cause a first user of the plurality of users to participate in an event proceeding in the game;
>     store, in the memory, ***a replacement package*** in association with the first user who has participated in the event, the ***replacement package being related to at least one game reward***;
>     ***update a group*** including the data package and the replacement package corresponding to the first user, ***by adding the at least one game reward indicated by*** the ***replacement package*** to the group, with deleting at least one game reward in association with the first user from the group;
>     generate first information for displaying an image of the replacement package;
>     generate second information for displaying at least a part of images of game rewards related to the updated group on a respective user device of the first user, the images of the game rewards having different appearances according to the rarity levels of the respective game rewards; and
>     give at least one game reward from the updated group to the first user.

'187 Patent, 17:61–18:24 (emphasis added). The claim plainly requires only that the replacement package is "related to" a game reward and that the game reward is "indicated by" the replacement package. Similarly, the patent describes an embodiment in which a replacement package includes a reward ID which is used as a key to extract more information about the reward from a "reward table." *See, e.g., id.*, 7:20–30, 12:50–60. As this exemplary embodiment of a replacement package does not include all the information about the reward, it cannot be said to contain the reward.

Ultimately, the patents describe and claim a replacement package that indicates a reward, such as through the reward ID, without containing the reward itself.

Accordingly, Defendant has not proven that any claim is indefinite for including any of the Group Terms. The Court further determines that these terms have their plain and ordinary meanings without the need for further construction.

### D.     "chat screen"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "chat screen"<br><br>• '771 Patent Claims 1, 7, 13<br>• '149 Patent Claims 1, 9, 17 | screen that permits a user to send and receive messages to and from other users | a window in which users transmit messages to each other in real time |

**The Parties' Positions**

Plaintiff submits: The "chat screen" is not necessarily a "window," is not necessarily something "in which users transmit messages to each other," and is not necessarily for "real time" communication. For instance, the '771 Patent and '149 Patent describe an embodiment in which messages are transmitted to and through a server rather than directly from user-to-user. The patents also describe chat push notifications for offline users, indicating that the messages are not necessarily transmitted in real time. *See* '771 Patent, 5:1–5. And under the customary meaning of "screen" "a screen on a monitor (or a mobile device) can have multiple windows open on it." Dkt. No. 50 at 21–23.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '771 Patent, Figure 1, 1:64–2:12, 5:1–5.

Defendant responds: The claims recite that the chat screen is displayed on a terminal rather than being the display of a terminal and the claims recite displaying various elements in the chat screen rather than simply on the terminal. This indicates that the chat screen has "boundaries … in

which other items can be displayed." In other words, the chat screen is a "window." In fact, during prosecution, both the patent examiner and Plaintiff referred to the chat screen (or equivalent) as a "window." The "chat screen" and "display" are separately recited in the claims and should therefore be understood to refer to different things. Further, the patents use "chat" as the term is customarily used, to refer to real-time communications (citing '149 Patent, 1:24–25, 3:64–67). Finally, nothing in Defendant's proposed construction requires "directly" transmitting messages between users. Dkt. No. 54 at 13–16.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '149 Patent, 1:24–25, 3:53–55, 3:64–67, 4:4–7, 5:36–40, 5:47–49, 6:14–16, 8:36–38, 8:40–42; Dkt. No. 55-9 at 8; Dkt. No. 55-8 at 9; Dkt. No. 55-11 at 2–3; Dkt. No. 55-10 at 11[9].

Plaintiff replies: A display of a mobile device may support more than one screen without the screens being windows. In fact, the term "windows" is often associated with the Microsoft operating system and should not be used to refer to screens on mobile devices which do not use that operating system. Nothing in the prosecution history equates the chat screen with a window. Further, as the '771 Patent and '149 Patents describe an "embodiment for communication through the chat screen that is not in real-time," a "real time" limitation is improper. Dkt. No. 56 at 4–6.

Plaintiff cites further **intrinsic evidence** to support its position: '771 Patent, 1:47–53.

<u>Analysis</u>

The dispute distills to two issues. First, whether the "chat screen" refers to the display device generally or to a window on the display. It refers to a viewing area on the display, but the Court declines to construe this as a "window" as "window" may improperly suggest other limitations.

---

[9] The '771 Patent and '149 Patent are each a continuation of the application that issued as U.S. Patent No. 10,391,388 ('388 Patent). '771 Patent, 1:5–10; '149 Patent, 1:5–10.

Second, whether the "chat" of the "chat screen" refers to real-time communication between or among users. It does. The chat screen must support this communication but is not necessarily limited to such communication.

The "chat screen" of the claims refers to a graphical interface on a display device. For instance, Claim 9 of the '149 Patent provides:

> A device comprising:
> circuitry configured to:
>> receive first data indicating one or more messages sent from one or more users,
>> ***display, on a display of a terminal, a chat screen*** comprising a game icon for entry to a game and the one or more messages based on the first data,
>> in response to the game icon being selected by the user, transmit second data indicating that the game icon is selected,
>> ***display*** a waiting message indicating waiting for an entry of at least one of the one or more users to the game ***in the chat screen*** after transmitting the second data;
>> receive a third data indicating a user of the one or more users who has selected the icon for the entry to the game while the waiting message is displayed,
>> display information indicating the user who has selected the icon for the entry to the game in the chat screen while the waiting message is displayed based on the third data,
>> when a number of a group associated with the game icon and a number of the users who have entered the game satisfy a first relationship, display a player group composed of the users who have entered the game in the chat screen,
>> receive fourth data relating a battle by the group, display the battle on the display based on the fourth data, and
>> display a result of the battle in the chat screen.

'149 Patent, 20:27–56 (emphasis added). Plainly, a "chat screen" is something that may be displayed on a display device and it includes features for interfacing with a user. Notably, the "chat screen" and the "display" are distinct from each other and items may be displayed in the chat screen which is displayed on the display device. In other words, the "chat screen" is a viewing area on a display device.

As used on the '771 Patent and '149 Patent, "chat" entails real-time communication. For instance, the patents describe:

> ***In a chat service, users communicate messages to each other <u>in real time</u>***. In detail, a user converses with other users registered in a group by exchanging messages, that is, does chatting. In such a chat service, the users converse with each other using texts or designed illustrations called "stickers."

'771 Patent, 1:24–28 (emphasis added). This expresses that the customary meaning of "chat" involves real-time communication. Similarly, the patents provide

> The chat section 11 serves as a message processing section. The chat section 11 includes a chat view section 111, a chat destination management section 112, and a message storage section 113.

> The chat view section 111 outputs a message, which is transmitted or received in the chat service, to a timeline view, which is displayed on the touch panel display. The chat view section 111 includes a transmission processing unit and a reception processing unit. The transmission processing unit displays a message input through the touch panel display as a comment of the user of the user terminal 10 (that is, the message is displayed as a user's own comment), and transmits the message to the chat server 20. The reception processing unit outputs a message received from the chat server 20 to the touch panel display as a comment of the user of another user terminal. Each user terminal 10 is connected to the chat server 20 through a chat socket. ***By the chat socket, <u>the information update is reflected in real time</u>, and shared between the respective user terminals 10.***

'771 Patent, 3:49–67 (emphasis added). This describes an embodiment of the invention in which "chat" is used according to its customary meaning. The Court is not convinced that the '771 Patent and '149 Patent describe a chat that is not real time. Plaintiff relies on the following disclosure:

> In a case where a user terminal 10 belonging to the chat group is in offline, the chat server 20 transmits a push notification to the user terminal 10. The user terminal 10 can be urged to activate the chat application by the push notification.

'771 Patent, 5:1–5. Rather than indicating a "chat" that is not real-time, this indicates that the chat application is inactive when the user is offline. This disclosure does not support straying from the customary meaning of "chat" as expressed in the patents. As such, a "chat screen" is a screen that facilitates or enables real-time exchange of messages.

Accordingly, the Court construes "chat screen" as follows:

- "chat screen" means "viewing area on a display that permits a user to send and
  receive messages to and from other users in real time."

### E. "battle," "conducting a battle by the player group," "conduct a battle by the player group," and "battle by the group"

| Disputed Term[10] | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "battle"<br><br>• '771 Patent Claims 1, 7, 13<br>• '149 Patent Claims 1, 9, 17 | fight or combat | a competitive match |
| "conducting a battle by the player group"<br><br>• '771 Patent Claims 1, 13 | | using the chat screen to engage in a competitive match by the [player] group |
| "conduct a battle by the player group"<br><br>• '771 Patent Claims 7 | | |
| "battle by the group"<br><br>• '149 Patent Claims 1, 9, 17 | | |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: Consistent with its ordinary meaning, "battle" in the claims refers to a fight or combat. There is no evidentiary support for broadening the term as Defendant suggests. Further,

---

[10] In their Joint Claim Construction Chart, the parties variably list "battle," "[conducting] battle by [player] group," and "[conducting] battle by the [player] group." *See, e.g.*, Dkt. No. 57 at 2–3; Dkt. No. 57-2 at 2; Dkt. No. 57-3 at 2. The parties also identified the actual claim language in dispute by emphasizing that language in a listing of claims. The Court lists and construes the actual claim language here.

a group engaging in a battle does not necessarily require the chat screen. In fact, the claims recite items that are necessarily in the chat screen, and the battle is not so limited. Dkt. No. 50 at 23–24.

In addition to the claims themselves, Plaintiff cites the following **extrinsic evidence** to support its position: Dkt. No. 50-8[11].

Defendant responds: The '771 Patent and '149 Patent describe a game involving a "match" and do not use the term "battle" outside the claim sets. Consistent with this, the parent patent (which shares the same description as the '771 Patent and '149 Patent) recites "match" instead of "battle" in its claims. There is no intrinsic support for an interpretation of "battle" other than as a match. As recognized by the examiners during prosecution, the distinction of the claims of the '771 Patent and '149 Patent over the prior-art of record is that the games of the claims proceed in the chat window whereas the game of the prior-art of record proceeded in a different window than the chat window. This is how Plaintiff characterized similar claims in prosecution of the parent patent. Dkt. No. 54 at 16–18.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '149 Patent, 1:29–35, 14:64–67; '388 Patent, 19:41–43; Dkt. No. 55-8 at 9; Dkt. No. 55-9 at 8; Dkt. No. 55-10 at 11; Dkt. No. 55-14 at 10.

Plaintiff replies: That the term "match" is used in the claims of the parent patent and the different term "battle" is used in the claims of the '771 Patent and '149 Patent indicates that "battle" and "match" are not coextensive. The examiner's stated reasons for allowing the '771 Patent and '149 Patent are not applicant statements and do not meet the exacting standard required to limit the battle to the chat screen. And the applicant's statements made during prosecution of the parent patent were addressed to claims involving generating and transmitting game messages

---

[11] An online dictionary definition.

rather than to claims involving a battle as recited in the '771 Patent and '149 Patent. Thus, the claims at issue here do not limit conduct of the battle to the chat screen. Dkt. No. 56 at 6–7.

Plaintiff cites further **intrinsic evidence** to support its position: Dkt. No. 55-9 at 8; Dkt. No. 55-8 at 9; '388 Patent, 19:41–43, 20:25–27, 20:54–56.

<u>**Analysis**</u>

There are two issues in dispute. First, whether "battle" in the claims is limited to a "fight" or "combat." It is not. While it encompasses a fight or combat, it plainly refers more generally to a contest or struggle. Second, whether the "battle" of the claims is necessarily engaged in using the chat screen. It is not.

The Court will not limit "battle" to a fight or combat as Plaintiff suggests. Notably, the dictionary definition that Plaintiff relies upon indicates that "battle" has a broader meaning than Plaintiff advocates. For instance, "battle" may refer to "an extended contest, struggle, or controversy" and to "a struggle to succeed or survive" in addition to "a combat between two persons." Dkt. No. 50-8 at 3. Plaintiff has not established that the narrower "combat" should apply. *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012) ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope.").

Similarly, the Court will not limit "battle" to "match," competitive or otherwise. Defendant has not established sufficient reason to stray from the customary meaning of "battle."

 The Court is likewise not persuaded that the intrinsic record cited by Defendant rises to the exacting standard required to limit conduct of a battle to the chat screen. Notably, the claims require that some game-related items are expressly displayed in the chat screen and others are not. For instance, Claim 1 of the '149 Patent recites "***displaying, on a display*** of the terminal, a chat

screen," "displaying a waiting message … *in the chat screen*," "displaying information indicating the user … *in the chat screen*," "displaying the battle *on the display*," and "displaying a result of the battle *in the chat screen*." '149 Patent, 19:35–65 (emphasis added). While displaying in the chat screen necessarily requires displaying on the display, since the chat screen is displayed on the display, the converse is not necessarily true. That is, displaying on the display may or may not involve displaying in the chat screen.

The prosecution history relied upon by Defendant is not a clear and unequivocal statement of an inherent limitation that would override the plain meaning of, e.g., Claim 1 of the '149 Patent. Specifically, the claim-scope statements made by the applicant during prosecution of the '388 Patent were directed to the pending claims, not to the "present invention" or like expression of the invention apart from the claims. *See, e.g.*, Dkt. No. 55-10 at 11 ("Again, in Hornell '925, the users do not use the chat window itself to play the game *as in the claimed invention*, but rather use a game application with the chat window being merely an auxiliary means of communication during the game.") (emphasis added). Likewise, the examiner's stated reasons for allowance are not a clear and unequivocal relinquishment of claim scope that would require all battle engagement in the chat screen when the claims plainly distinguish between displaying on a display and displaying in a chat screen.

Accordingly, the Court rejects the parties' proposed constructions of "battle" and Defendant's proposed constructions that would limit the battle to the chat screen and determines that these terms have their plain and ordinary meanings without the need for further construction.

###### F.      "receiv[e/ing] the entry of the second user"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "receiv[e/ing] the entry of the second user"<br><br>• '771 Patent Claims 1, 7, 13 | plain and ordinary meaning, no construction needed | indefinite |

**The Parties' Positions**

Plaintiff submits: "Supercell has not carried its burden, offering no expert testimony regarding how one of skill in the art would understand this term or why such an individual would find the term indefinite." In the context of the surrounding claim language, the meaning of this term is reasonably certain, it refers to "the entry to the game" of the second user earlier recited in the claims. Dkt. No. 50 at 24–25.

In addition to the claims themselves, Plaintiff cites the following **extrinsic evidence** to support its position: Dkt. No. 50-7 ¶¶ 51–53.

Defendant responds: There is no antecedent reference in the claims of an "entry of the second user" to support recitation of "the entry of the second user" and it is further not clear whether "entry" refers to a message that is transmitted or a user's appearance in the game. Ultimately, it is unclear whether the term refers to receiving a message of the second user or the second user entering the game. Dkt. No. 54 at 18–20.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '149 Patent, 7:48–49, 12:61, 13:19–20. **Extrinsic evidence**: Dkt. No. 55-15 at 5; Dkt. No. 55-16 at 4.

Plaintiff replies: Defendant has offered no rebuttal to the expert testimony that the meaning of this term is reasonably certain and therefore necessarily "cannot meet its clear and convincing

burden to show indefiniteness." Further, it is clear in the context of the surrounding claim language

that the entry of the second user refers to the second user's entry to the game. Dkt. No. 56 at 7–8.

**<u>Analysis</u>**

The issue in dispute is whether the meaning of this term is reasonably certain. It is. It refers to

the second user's entry to the game.

The claims of the '771 Patent provide significant context indicating that the term in dispute

refers to the second user's entry to the game. For instance, Claim 1 provides:

> A game control method comprising:
> transmitting, to terminals of a plurality of users, data for displaying a chat
>   screen comprising ***a game icon for <u>entry to a game</u>*** and one or more messages
>   sent from at least a part of the plurality of users;
> causing display of the game icon in the chat screen on a terminal of a first user
>   of the plurality of users;
> in response to selection of the game icon by the first user,
>> transmitting, to the terminal of the first user, data for displaying a waiting
>>   message indicating ***waiting for an <u>entry of another user to the game</u>*** in
>>   the chat screen, and
>> transmitting, to terminals other than the terminal of the first user, data for
>>   displaying an icon for the entry to the game in the chat screen;
> in response to the ***icon for the <u>entry to the game</u> being selected by a second
>   user*** other than the first user, ***<u>receiving the entry of the second user</u>***;
> when a number of a group associated with the game icon and a number of users
>   who have entered the game satisfy a first relationship, transmitting, to at least
>   a part of the terminals of the plurality of users, data for displaying a player
>   group including at least the first user and ***the second user who <u>has entered
>   the game</u>*** in the chat screen;
> conducting a battle by the player group; and
> transmitting, to at least part of the terminals of the plurality of users, data for
>   displaying a result of the battle in the chat screen.

'771 Patent, 19:35–64 (emphasis added). While the exact phrase "entry of the second user" is not

recited before the term at issue, it is present by implication in the phrase "in response to the icon

for the entry to the game being selected by a second user." Plainly, when the second user selects

the icon for "entry to the game," the second user seeks to enter the game. In response to the

selection, the claimed method receives "the entry of the second user." The only reasonable

interpretation of this is that the "entry" the method receives is the "entry to the game" that triggers the receiving.

Accordingly, Defendant has not proven any claim is indefinite for including "receiv[e/ing] the entry of the second user." The Court further construes the term as follows:

- "receiv[e/ing] the entry of the second user" means "receiv[e/ing] the entry to the game of the second user."

### G.    "satisfy a first relationship"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "satisfy a first relationship"<br><br>• '771 Patent Claims 1, 7, 13 | plain and ordinary meaning, no construction needed | indefinite |

**The Parties' Positions**

Plaintiff submits: This term is broad but it is not indefinite, it encompasses "any manner of relationship" between the "number of a group …" and the "number of users …" recited in the claims. Dkt. No. 50 at 25–26.

In addition to the claims themselves, Plaintiff cites the following **extrinsic evidence** to support its position: Dkt. No. 50-9[12] ¶¶ 30–31; Dkt. No. 50-7. ¶¶ 56–57.

Defendant responds: "The term 'satisfy a first relationship' is indefinite because there are no objective boundaries for measuring the scope of the term." There are any number of relationships that may be satisfied, "[t]hus, whether the relationship between the two numbers is satisfied is a term of degree." And the '771 Patent does not provide the requisite guidance regarding this term of degree. Dkt. No. 54 at 20–21.

---

[12] Declaration of Professor José Zagal in Support if Defendant's Claim Constructions (Dec. 1, 2020).

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '771 Patent, Figures 4, 7, 18, 21. **Extrinsic evidence**: Dkt. No. 50-7 ¶¶ 56–57; Dkt. No. 50-9 ¶¶ 30–31.

Plaintiff replies: This term is neither subjective nor a term of degree. Rather, it "refers to various ways of comparing two numbers." Dkt. No. 56 at 8.

Plaintiff cites further **extrinsic evidence** to support its position: Dkt. No. 50-7 ¶ 58.

### Analysis

The issue in dispute is whether the meaning of this term is reasonably certain. It is. In the context of the claims and description of the '771 Patent, it refers to a comparison between the "number of a group …" and the "number of users …" recited in the claims to determine whether the relationship of these two numbers match a condition.

The context of the surrounding claim language indicates that this term refers to a condition that when matched by the numbers recited in the claims triggers action in the claims. Specifically, the term is found in the following phrase: "when a number of a group associated with the game icon and a number of users who have entered the game satisfy a first relationship, [transmit data for displaying a group]" '771 Patent, 19:54–60, 20:38–44, 21:25–31. This indicates that the relationship between the numbers is compared to the "first relationship" to determine if the relationships match (the numbers "satisfy a first relationship"). An example of such a determination is described in the '771 Patent with reference to the flow depicted in Figure 21 (as discussed in more detail in the section on "a number of a group …"):

> [T]he chat management section 21 performs the determination process on whether it is possible to generate a group (Step S6-8). . . .The game management system . . . . compares the number of users (the number of entries) expressing "Participation" with the number of groups. In a case where the number of entries is equal to or larger than two times the number of groups, the chat management section 21 determines that it is possible to generate a group. . . . [I]n a case where the number

> of entries is enough to generate a group ("YES" in Step S6-8), the chat management section 21 performs a grouping process (Step S6-10). . . . Next, the chat management section 21 performs the message display process (Step S6-11). Specifically, the game management section 212 outputs a message indicating the grouping result to each user terminal 10.

*Id.*, 18:6–42. The numbers are compared with a predetermined relationship, and if the numbers match this relationship (they satisfy the relationship), the players are grouped, and the grouping is transmitted for display.

The Court agrees with Plaintiff that the scope of "satisfy a first relationship" is an issue of breadth rather than an issue of indefiniteness. The Federal Circuit addressed a similar issue in *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360 (Fed. Cir. 2017). There, the Federal Circuit criticized—and reversed—a district court that: "credit[ed] [the expert's] assertion that 'a practically limitless number of materials' could [meet the limitation], and . . . treat[ed] that scope as 'indicating that the claims, as written, fail to sufficiently identify the material compositions.'" *Id.* at 1367. The Federal Circuit held that "the inference of indefiniteness simply from the scope finding is legally incorrect: 'breadth is not indefiniteness.'" *Id.* (quoting *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1341 (Fed. Cir. 2005)). Here, while there may be a practically limitless number or relationships between the two numbers that can be used to trigger the "transmit[ting]" as recited in the claims, whether a particular prior-art or accused instrumentality uses a relationship between numbers as recited in the claims will be reasonably certain.

Accordingly, the Court holds that Defendant has not proven any claim is indefinite for including "satisfy a first relationship." The Court further construes this term as follows:

- "satisfy a first relationship" means "match a predetermined relationship."

### H.    "a number of a group associated with the game icon"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "a number of a group associated with the game icon"<br><br>• '771 Patent Claims 1, 7, 13 | plain and ordinary meaning, no construction needed | indefinite |

**The Parties' Positions**

Plaintiff submits: "[T]his number represents a number of users required to be in a group to participate in the game, and it is the game icon that defines the number of players in this group." Dkt. No. 50 at 26–27.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '771 Patent, Figure 21, 18:10–19:24. **Extrinsic evidence**: Dkt. No. 50-9 ¶¶ 23–27; Dkt. No. 50-7 ¶¶ 63–66.

Defendant responds: The '771 Patent does not provide any guidance as to what is required of a "group associated with" a game icon. Notably, nothing in the patent suggests that the group is a group of players or users, rather than, e.g., "a group of messages or game objects." Dkt. No. 54 at 21–26.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '771 Patent, Figure 21, 1:65–66, 4:2–5:40, 5:60–61, 7:22–23, 17:60–65. **Extrinsic evidence**: Dkt. No. 50-9 ¶¶ 25–27; Dkt. No. 50-7 ¶¶ 63–66.

Plaintiff replies: In the context of the surrounding claim language requiring that "a number of a group associated with the game icon" is compared with a "a number of users …," it is reasonably certain that the "number of a group …" refers to a number of users in a group. Dkt. No. 56 at 8–9.

**Analysis**

The issue in dispute is whether the meaning of this term is reasonably certain. It is. It refers the number of user "entries" required to form a group associated with the game.

The meaning of this term is informed by the '771 Patent's disclosure of determining whether a game group can be formed given the number of users that have entered the game. Specifically, with reference to Figure 21 (reproduced here and annotated by the Court), the patent provides:



In a case where it is determined that the entry period has ended (Step S6-5) or all the users have completed the entries ("YES" in Step S6-7), the chat management section 21 performs the determination process on whether it is *possible to generate a group* (Step S6-8). Specifically, the game management section 212 *acquires the number of groups based on the game logic* recorded in the logic storage section 24. The game management section 212 acquires the number of user IDs associated with "Participation" with reference to the game management table, and *compares the number of users (the number of entries) expressing "Participation" with the number of groups*. In a case where *the number of entries is equal to or larger than two times the number of groups*, the chat management section 21 determines that it is possible to generate a group.

In a case where it is determined that it is *not possible to generate a group due to an insufficient number of entries* ("NO" in Step S6-8), the chat management section 21 performs an error message process (Step S6-9). Specifically, the game management section 212 outputs a message indicating the fact that it is not possible

> to generate a group to each user terminal 10 which belongs to the chat group. The procedure returns to the process of Step S6-1.
>
> On the other hand, in a case where the ***number of entries is enough to generate a group*** ("YES" in Step S6-8), the chat management section 21 performs a grouping process (Step S6-10). Specifically, the game management section 212 identifies the user IDs recorded with "Participation" using the game management table. The game management section 212 divides the user IDs into groups as many as the number of groups. For example, a random value is assigned to each user ID, and the users can be grouped in a descending order of the assigned random values.

'771 Patent, 8:6–38 (emphasis added). After the game icon is selected (S6-2, in green), and all the user entries are completed, a determination of whether there are sufficient entries to form a group for the associated game is made (S6-8, in orange). This is based on a comparison of the number required by a group for the game and the number of users who have entered the game. In this context, the meaning of "a number of a group associated with the game icon" is reasonably certain.

Accordingly, Defendant has not proven any claim is indefinite for including "a number of a group associated with the game icon." The Court further construes this term as follows:

- "a number of a group associated with the game icon" means "a number of users required to generate a group for the game."

**I.  "… display[ing] a result of the battle in the chat screen …" and "… the result of the battle is displayed in the chat screen …"**

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "data for displaying a result of the battle in the chat screen"<br><br>• '771 Patent Claims 1, 7, 13 | plain and ordinary meaning, no construction needed | plain and ordinary meaning, which requires displaying a result of the battle in the chat screen |
| "display[ing] a result of the battle in the chat screen"<br><br>• '149 Patent Claims 1, 9 | plain and ordinary meaning, no construction needed | plain and ordinary meaning, which requires displaying a result of the battle in the chat screen |

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "wherein the result of the battle is displayed in the chat screen based on the fifth data"<br><br>• '149 Patent Claims 2, 10, 18 | plain and ordinary meaning, no construction needed | plain and ordinary meaning, which requires displaying a result of the battle in the chat screen |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: The claims of the '149 Patent require simply that "a" result of the battle is displayed in the chat screen while the claims of the '771 Patent require simply the transmission of data for displaying a result in the chat screen rather than the displaying itself. Dkt. No. 50 at 27–28.

Defendant responds: Plaintiff improperly proposes that "that the claims do not require displaying or data for displaying any result of the battle in the chat screen, but that a battle result can instead be shown in a different screen." Dkt. No. 54 at 26–28.

Plaintiff replies: "Despite acknowledging that the '771 Patent claims only require 'transmitting . . . data for displaying a result of the battle in the chat screen,' Supercell insists that these claims also require the actual display of the data in the chat screen." "In the '149 Patent, the claims already contain the limitation Supercell seeks to add." Dkt. No. 56 at 9–10.

**Analysis**

The issue in dispute appears to distill to whether "data for displaying a result of the battle in the chat screen" necessitates actually displaying a result of the battle in the chat screen. It does not. At the hearing, the parties agreed on this issue.

Accordingly, the Court rejects that the "data for displaying …" term of the claims of the '771 Patent requires displaying a result of the battle in the chat screen and further determines that this term and the display terms of the '149 Patent have their plain and ordinary meanings without the need for further construction.

**J.      "display[ing] the battle on the display based on the fourth data"**

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "display[ing] the battle on the display based on the fourth data"<br><br>• '149 Patent Claims 1, 9, 17 | plain and ordinary meaning, no construction needed | displaying the battle within the chat screen based on the fourth data |

**The Parties' Positions**

Plaintiff submits: The "display" and "chat screen" of the claims are not coextensive and the claims recite display of a battle on "the display" rather than "within the chat screen" as Defendant proposes. Nothing in the intrinsic record mandates Defendant's proposed limitation. Dkt. No. 50 at 29.

Defendant responds: During prosecution of the '149 Patent's parent patent, the applicant "unequivocally disavowed from the scope of the claims games which are not played within the chat window." Dkt. No. 54 at 28–30.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: Dkt. No. 55-10 at 11; Dkt. No. 55-18 at 4; Dkt. No. 55-14 at 10.

Plaintiff replies: The applicant's statements made during prosecution of the parent patent were addressed to claims involving generating and transmitting game messages rather than to claims involving a battle as recited in the '149 Patent. Thus, the claims at issue here do not limit conduct of the battle to the chat screen. Dkt. No. 56 at 10.

Plaintiff cites further **intrinsic evidence** to support its position: Dkt. No. 55-14 at 9, 11.

<u>Analysis</u>

The issue in dispute distills to whether the invention of the '149 Patent inherently requires displaying the battle within the chat screen when the claims expressly recite displaying the battle on the display. It does not.

The issue raised by this dispute is similar to that addressed by the Court with regard to the "conduct a battle" term. For the reasons given there, the invention is not inherently limited to displaying all aspects of the game in the chat screen.

Accordingly, the Court rejects Defendant's proposed construction and determines that this term has its plain and ordinary meaning without the need for further construction.

### K.      **"the users who have entered the game"**

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "the users who have entered the game"<br><br>• '149 Patent Claims 1, 9, 17 | plain and ordinary meaning, no construction needed | indefinite |

<u>The Parties' Positions</u>

Plaintiff submits: This term refers to "the set of users that selected either a game icon for entry to the game or an icon for entry to the game, as described earlier in the claim." Dkt. No. 50 at 29–30.

In addition to the claims themselves, Plaintiff cites the following **extrinsic evidence** to support its position: Dkt. No. 50-7 ¶¶ 67–69.

Defendant responds: There is no antecedent recitation of "users who have entered the game" to support recitation of "the users who have entered the game" and there are a number of plausible interpretations of this phrase. This could refer to "(1) 'the user' who has selected 'the game icon

for entry to a game'; (2) 'a user of the one or more users who has selected the icon for the entry to the game'; and (3) 'one or more users' who have sent messages." Or it could refer to some combination of the user who has selected the game icon and users who have selected the icon for entry to the game. Dkt. No. 54 at 30–31.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '149 Patent, Figures 15–17, 14:32–46.

Plaintiff replies: Defendant has offered no rebuttal to the expert testimony that the meaning of this term is reasonably certain. Further, Defendant posits an unreasonable interpretation of this term to encompass one or more users who have sent messages. Dkt. No. 56 at 10–11.

**<u>Analysis</u>**

The issue in dispute is whether the meaning of this term is reasonably certain. It is. It refers to the users that have entered the game as set out in the claims, through the selection of an icon for entry to the game.

The claims provide significant context indicating that the users who have entered the game are those that entered the game through selection of a game-entry icon. For instance, Claim 1 of the '149 Patent provides as follows:

> A game control method at a terminal used by a user, the method comprising:
> receiving first data indicating one or more messages sent from one or more
>   users;
> displaying, on a display of the terminal, a chat screen ***comprising a game icon***
>   ***for <u>entry to a game</u>*** and the one or more messages based on the first data;
> in response to ***<u>the game icon being selected</u>*** by the user, transmitting second
>   data indicating that the game icon is selected;
> displaying a waiting message indicating ***waiting for an <u>entry</u> of at least one of***
>   ***the one or more users*** to the game in the chat screen after transmitting the
>   second data;
> receiving a third data indicating ***a user of the one or more users who has***
>   ***<u>selected the icon</u> for the <u>entry to the game</u>*** while the waiting message is
>   displayed;

> displaying information indicating the user who has selected the icon for the entry to the game in the chat screen while the waiting message is displayed based on the third data;
>
> when a number of a group associated with the game icon and a number of ***the users who have <u>entered the game</u>*** satisfy a first relationship, displaying a player group composed of the users who have entered the game in the chat screen;
>
> receiving fourth data relating a battle by the group;
>
> displaying the battle on the display based on the fourth data; and
>
> displaying a result of the battle in the chat screen.

'149 Patent, 19:35–65 (emphasis added). The only reasonable interpretation of "the users who have entered the game" is that it refers to the user that selects the "game icon for entry to a game' and "a user of the one or more users who has selected the icon for the entry to the game."

Accordingly, Defendant has not proven any claim is indefinite for including "the users who have entered the game." The Court further determines that this term has its plain and ordinary meaning without the need for further construction.

### L. "the icon"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "the icon" <br><br> • '149 Patent Claims 1, 9, 17 | "an icon" | indefinite |

**The Parties' Positions**

Plaintiff submits: In the context of the surrounding claim language, this term refers to an icon "selected by a one or more other users for entry to the game." This icon is not the "game icon" of the chat screen displayed on the first user's terminal as the one or more other users do not access the first user's terminal. Dkt. No. 50 at 30–32.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '771 Patent, Figure 4, Figure 7, Figure 18, Figure 21, 7:45–55. **Extrinsic evidence**: Dkt. No. 50-7 ¶¶ 71–73.

Defendant responds: There is no antecedent reference in the claims to an "icon" other than the "game icon" to support recitation of "the icon." And there is no description in the '149 Patent of any icon other than the "game icon" being used by a user to enter a game. Thus, even if the term "the icon" had sufficient antecedent basis (which it does not), it is unclear what "the icon" is or when or how it would be presented to users. Dkt. No. 54 at 31–33.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '149 Patent, Figure 4, Figure 7, Figure 17, Figure 18, Figure 21, 6:20–39, 7:45–55, 14:5–46.

Plaintiff replies: "[T]here is only one reasonable interpretation for this term based on consideration of the claim language and the specification, that the term refers to 'an icon' for selection that is different from the game icon." Dkt. No. 56 at 11.

**<u>Analysis</u>**

The issue in dispute is whether the meaning of this term is reasonably certain. It is.

The only reasonable interpretation of this term is that it refers to an icon used by users of terminals other than the one that displays the "game icon." The claims themselves provide significant guidance regarding the meaning of "the icon." For instance, Claim 1 of the '149 Patent provides:

> A game control method at a terminal used by a user, the method comprising:
> ***receiving*** first data indicating one or more messages sent from one or more users;
> ***displaying***, on a display of the terminal, a chat screen comprising ***a game icon for entry to a game*** and the one or more messages based on the first data;
> in response to ***the game icon being selected by the user***, ***transmitting*** second data indicating that the game icon is selected;
> displaying a waiting message indicating ***waiting for an entry of at least one of the one or more users to the game*** in the chat screen after transmitting the second data;

> *receiving* a third data indicating a user of the ***one or more users who has***
> ***<u>selected the icon</u> for the entry*** to the game while the waiting message is
> displayed;
> displaying information indicating the user who has selected the icon for the
> entry to the game in the chat screen while the waiting message is displayed
> based on the third data;
> when a number of a group associated with the game icon and a number of the
> users who have entered the game satisfy a first relationship, displaying a
> player group composed of the users who have entered the game in the chat
> screen;
> receiving fourth data relating a battle by the group;
> displaying the battle on the display based on the fourth data; and
> displaying a result of the battle in the chat screen.

'149 Patent, 19:36–65 (emphasis added). The claim is directed to controlling a user's terminal for

a game involving one or more other users. The user's terminal displays a game icon for the user's

entry into the game and various indications of the status of other users. The terminal also transmits

and receives data related to the other users' participation in the game. The structure of the claim

indicates that the other users are not participating through the user's terminal such that they could

select the same game icon the user selected to enter the game. Indeed, the invention of the '149

Patent is directed to improving messaging amongst multiple user terminals during gameplay. *See*

*e.g.*, '149 Patent, 1:14–16 ("The present invention relates to a technology in which messages are

transmitted or received using an information processing terminal."), 1:36–38 ("In a chat according

to the conventional art, a user's input text or selected sticker is displayed on a timeline view of the

terminals of all participants in the chat …."), 1:57–60 ("it is an objective of the invention is to

provide a program, a method, and a system of communicating a message in order to achieve variety

of communication in chatting"). And Defendant has not identified any embodiment in the patent

where multiple users are using the same terminal. In this context, it is not reasonable to interpret

"the icon" selected by the other users to enter the game as the "game icon" of the first user's

terminal. *Phillips*, 415 F.3d at 1316 (Fed. Cir. 2005) (en banc) ("The construction that stays true

to the claim language and most naturally aligns with the patent's description of the invention will

be, in the end, the correct construction." (quotation marks omitted)); *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016) ("The only meaning that matters in claim construction is the meaning in the context of the patent."). Indeed, the Court's understanding of "the icon" comports with the use of "the icon" in the related claims of the '771 Patent. *See, e.g.*, '771 Patent, 19:48–53.

Accordingly, Defendant has not proven any claim is indefinite for including "the icon." The Court further construes this term as follows:

- "the icon" means "an icon."

## V.    CONCLUSION

The Court adopts the constructions above for the disputed and agreed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 15th day of March, 2021.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE